UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Civil Case No. ________________

JANE DOE, as parent and legal guardian of JOHN DOE, a minor,

Plaintiff,

v.

EASTER SEALS NEW HAMPSHIRE, INC.,

Defendant.

## COMPLAINT AND JURY DEMAND

The plaintiff, Jane Doe ("Ms. Doe"), as parent and legal guardian of John Doe ("John"), a minor, brings this action to recover against Easter Seals New Hampshire, Inc. ("Easter Seals").

## PARTIES

1. Plaintiff Ms. Doe is the parent and legal guardian of John, a minor. Both are, and at all relevant times have been, residents of Essex County, Massachusetts.

2. John is the son of Ms. Doe and a Massachusetts resident.

3. Easter Seals is a New Hampshire Nonprofit Corporation with its principal place of business located at 555 Auburn Street, Manchester, NH 03101.

## VENUE AND JURISDICTION

4. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) based on diversity of the citizenship of the parties and an amount in controversy that exceeds $75,000.

5. Venue is appropriate under 28 U.S.C. § 1391(b) because Easter Seals' principal place of business is in this judicial district, a substantial part of the events and omissions giving rise to the claim occurred here, and Easter Seals is subject to this Court's personal jurisdiction.

## FACTS

6. Easter Seals is a social services agency that, among other programs, operates residential programs and schools for children whose disabilities require specialized, therapeutic supports and services.

7. The Massachusetts Department of Elementary and Secondary Education has approved Easter Seals' residential schools as out-of-state special education schools, and the Massachusetts Department of Children and Families ("DCF") contracts with Easter Seals to provide residential placements for children whose needs cannot be met in a less restrictive setting.

8. John is fifteen years old. He has been diagnosed with mild intellectual disability and developmental trauma disorder.

9. As a baby and young child, John was exposed to significant domestic violence and experienced years of housing instability and homelessness.

10. In 2022, John was eleven years old and had been repeatedly psychiatrically hospitalized and screened in emergency departments for instances of aggression, dysregulation, and self-harm.

11. Immediately prior to his placement at Easter Seals, John was psychiatrically hospitalized for self-injury, assaultive behaviors towards his family, and threats to run away from his home.

12. DCF determined John was not safe to return to his family's home. On December 27, 2022, DCF placed John as a residential student at Easter Seals's Merrimack Hall, located at 200 Zachary Road, Manchester, NH.

13. Ms. Doe maintained shared custody of John with DCF at all times.

14. At the time of John's admission, Easter Seals's records indicated that John had a history of "threatened elopement, violence, and aggression" and had "experienced [suicidal ideation] and [homicidal ideation] when angry and dysregulated." Intake paperwork also documented that John was "a head banger and will punch himself in the head."

15. Easter Seals documentation dated shortly after John's arrival at Easter Seals reflected that he was not able to "maintain safety in the home or in the community" or to "create and maintain safe boundaries."

16. Easter Seals set an initial goal that John would "maintain appropriate boundaries with staff and peers when upset" in only two out of five opportunities.

17. In short, John was placed at Easter Seals because he required intensive, around-the-clock supervision and support to maintain his basic safety. Easter Seals was aware of his needs at the time of his admission.

18. Easter Seals placed John on a boys' unit at its Zachary Road campus with other students up to the age of fifteen.

19. Easter Seals placed John in his own room.

20. Shortly after John began at Easter Seals, three different students made sexually aggressive remarks to him.

21. One student living on the same unit as John was an older boy named K.

22. According to an Easter Seals employee, K. was known to have engaged in sexually aggressive behaviors. Easter Seals assigned him a one-to-one aide because he posed a safety risk.

23. Easter Seals subsequently reduced K's level of staffing, however, despite continuing concerns about his level of sexual aggression.

24. On October 5, 2023, K. entered John's room uninvited. No adult stopped him or intervened.

25. K. sat down on John's bed and asked John to pull down his pants.

26. K. then placed John's penis in his mouth.

27. K. pulled down his own pants and instructed John to perform oral sex on him.

28. John initially refused, but K. pushed John's head down towards his lap. Frightened, John complied.

29. K. then instructed John to lay down on the bed. K. penetrated John's anus with his penis.

30. John asked K. to stop, but he did not.

31. K. did not stop until he heard staff voices in the hallway, which caused him to run out of John's room.

32. Easter Seals's staff made no investigation into why K. was in John's room.

33. The next day, on October 6, 2023, John disclosed to Easter Seals staff that K. had sexually assaulted him.

34. John was taken to Elliot Hospital Emergency Department. There, medical providers recorded John's report that K. had forced him to perform "penile oral intercourse and both receptive and insertive penile anal intercourse."

35. Elliot Hospital staff then contacted Ms. Doe, who provided permission for the hospital to complete a forensic examination and infectious disease testing.

36. Elliot Hospital providers completed the forensic examination, as well as blood work and urine screening for sexually transmitted infections.

37. John expressed discomfort and embarrassment with having to get undressed at the hospital and having hospital staff conduct a forensic examination. He asked to change in the bathroom, out of view of staff. Hospital child life specialists were brought in to support him through the ordeal.

38. The Easter Seals staff person who brought John to the hospital reportedly knew nothing about assault and directed the hospital social worker to the Easter Seals nursing department. The hospital social worker then contacted the school's nursing department. The Easter Seals nurse to whom John had disclosed the assault was not made available, and the nursing staff available was only able to read from a nursing note what had occurred. No other information was provided by Easter Seals to hospital staff.

39. Hospital staff reported the assault to the Manchester Police Department and the New Hampshire Department of Children, Youth, and Families. The hospital requested John follow up with the hospital's outpatient Child Advocacy and Protection Program ("CAPP").

40. The evidence collected from the forensic examination was turned over to the Manchester Police Department.

41. On October 18, 2023, John was seen by CAPP at Elliot Hospital for a follow up to the assault. He was brought to the appointment by an Easter Seals staff member who again reported that he had limited information about the assault. The staff member did note, however, that K. "had demonstrated sexually aggressive behaviors previously and had a 1:1" although his level of supervision "had been reduced" as he seemed to be improving.

42. John again reported to the CAPP provider, Amy D. Roy, M.D., that he had been sexually assaulted by K.

43. Dr. Roy noted that "supports and services must be provided at Easter Seals to ensure John's safety and the safety of other youth in that setting." She recommended that John engage in counseling, preferably with a provider with experience in teen trauma and abuse.

44. The Manchester Police Department investigated the sexual assault. The district attorney's office told Ms. Doe that they intended to pursue delinquency charges against K. arising from the assault.

45. On information and belief, K. was aware of the police investigation and the threat of charges being brought against him.

46. Easter Seals did little or nothing to protect John from retaliation or further assaults against him by K.

47. Easter Seals staff continued to allow John and K. to live on the same unit together, even though there were other options available that would have kept them apart.

48. Sometime after the sexual assault, John was in a common space in the unit he shared with K.

49. As John was leaving the area, K. rushed up to him, put John into a headlock, choked and hit John, and expressed anger that John had reported K.'s assault of John.

50. Records from Easter Seals reflect that John had significant emotional and behavioral challenges in the months following the assault. Documents from the school in November 2023 reflect that John had a "difficult quarter . . . across all domains" and displayed sexualized behaviors.

51. Easter Seals records for John indicate that the assault was "reported and undergoing investigation."

52. Easter Seals assured Ms. Doe that it would investigate the assaults, including whether and how K. was able to enter John's room without staff intervention and how K. was able to assault John twice, despite both boys' need for close supervision.

53. Despite this assurance, Easter Seals never provided Ms. Doe with any additional information regarding its supposed investigation or any efforts taken by Easter Seals to protect John from further abuse.

54. John's school records from Easter Seals include only passing reference to the assault. These records do not contain any incident report or formal investigation of the assault or any findings or recommendations about how to keep John or other students safe in the future.

55. K's sexual assault of John occurred at a time when both John and Ms. Doe were relying on Easter Seals to provide him with a safe and nurturing therapeutic environment.

56. Easter Seals was aware from the time of John's admission that he had a history of aggression and challenges navigating safe boundaries with peers.

57. Easter Seals staff knew K. to be sexually aggressive and to require a one-to-one aide. Despite that knowledge, Easter Seals failed to provide K. with the necessary supervision to keep him and his peers safe.

58. Instead of protecting John, Easter Seals did just the opposite, allowing K. the opportunity to sexually assault John in John's room at Easter Seals, an area that should have been heavily supervised.

59. Even after the sexual assault, Easter Seals failed to provide adequate supervision and oversight of John and K., leading to K.'s choking and hitting John several weeks later in retribution for John reporting the assault.

60. John has suffered deeply, both as a result of the sexual assault, and from the lack of appropriate care, supervision, and therapeutic support from Easter Seals thereafter. Incredibly, Easter Seals left the two boys on the same unit and sharing the same common spaces, which resulted in a further retaliatory attack by K. for reporting the assault. Following the assaults, John grew increasingly behaviorally dysregulated. Eventually, he required an even more specialized residential school for students with challenging behaviors.

**COUNT 1**
**(Negligence)**

61. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 60.

62. Defendant owed a duty to exercise reasonable care to assure the safety of its residential students.

63. Defendant owed a duty to exercise reasonable care for the protection of John against sexual assault, abuse, assault, and other mistreatment by peers.

64. Defendant breached its duty of care owed to John by failing to provide basic supervision to John and to K., a known sexual aggressor.

65. By its actions and inactions, Defendant caused John to be subjected to the injuries described above.

66. As a direct and proximate result of the Defendant's negligence, John was harmed and sustained physical injuries, emotional injuries, mental anguish, embarrassment, humiliation, pain, diminished childhood, and loss of educational, developmental, and therapeutic opportunities. Many of John's injuries are permanent and continuing in nature.

67. As a direct and proximate result of Defendant's negligence, John suffered physical injuries, incurred medical treatment and bills, and will likely be caused to incur medical expenses, including counseling and other therapeutic services, in the future.

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. That the Court enter judgment on Count I against the Defendant and in favor of Plaintiff, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs associated with this action.

Plaintiff demands a trial by jury for all issues so triable.

Dated: October 2, 2026

/s/ Richard L. O'Meara
Richard L. O'Meara
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
(207) 773-5651
*E-mail:* romeara@mpmlaw.com

/s/ Eliza L. M. Presson
Eliza L. M. Presson*
KOTIN, CRABTREE & STRONG, LLP
Three Newton Executive Park
2223 Washington Street, Suite 101
Newton, MA 02462
(617) 227-7031
*Email:* epresson@kcslegal.com

** to be admitted pro hac vice*

/s/ Daniel Heffernan
Daniel Heffernan*
KOTIN, CRABTREE & STRONG, LLP
Three Newton Executive Park
2223 Washington Street, Suite 101
Newton, MA 02462
(617) 227-7031
*Email:* dheffernan@kcslegal.com

** to be admitted pro hac vice*